## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| **MICHELE WATSON**, on behalf of herself and all others similarly situated, | Case No. 2:25-cv-2180 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| **COMMUNICATIONS DATA GROUP, INC,** d/b/a **CDG, DUO COUNTY TELEPHONE COOPERATIVE CORPORATION, INC.** d/b/a **DUO BROADBAND,** and **CUMBERLAND CELLULAR, LLC,** d/b/a **DUO BROADBAND**, | |
| Defendants. | |

Michele Watson ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Communications Data Group, Inc. (d/b/a CDG); Duo County Telephone Cooperative Corporation, Inc. (d/b/a Duo Broadband); and Cumberland Cellular, LLC (d/b/a Duo Broadband) (together "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.      This class action arises from Defendants' failure to protect highly sensitive data.

1

2.      Defendants Duo County Telephone Cooperative Corporation, Inc. and Cumberland Cellular, LLC operate under the shared branding "Duo Broadband" and sell telecommunications services throughout Kentucky.[1]

3.      Defendant Communications Data Group, Inc. is a SaaS business that sells "broadband, data, utility, and interconnect services" to telecommunications companies.[2] Since at least 2024, Defendant Communications Data Group, Inc. has provided telecommunications services to Duo Broadband.[3]

4.      As such, Defendants stores a litany of highly sensitive personal identifiable information ("PII") about their current and former customers. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

5.      It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to their current and former customers' PII.

6.      On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

---

[1] *About Duo Broadband*, Duo Broadband https://duobroadband.com/contact-legal-company-information/ (last visited May 20, 2025).
[2] *Home Page*, CDG https://cdg.us/ (last visited May 20, 2025).
[3] *Duo Broadband Selects CDG's BSS/OSS Solutions*, CDG (June 29, 2024) https://cdg.us/duo-broadband-selects-cdgs-bss-oss-solutions/.

7.    Plaintiff is a Data Breach victim, having received a breach notice—attached as Exhibit A. She brings this class action on behalf of herself, and all others harmed by Defendants' misconduct.

8.    The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, their current and former customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

9.    Plaintiff, Michele Watson, is a natural person and citizen of Burkesville, Kentucky where she intends to remain.

10.    Defendant, Communications Data Group, Inc d/b/a CDG, is a corporation incorporated in Delaware and with its principal place of business at 2107 S Neil Street, Champaign, Illinois 61820.

11.    Defendant, Duo County Telephone Cooperative Corporation, Inc. d/b/a Duo Broadband, is a corporation incorporated in Kentucky and with its principal place of business at 2150 N Main Street, Jamestown, Kentucky 42629.

12.    Defendant, Cumberland Cellular, LLC, d/b/a Duo Broadband, is a limited liability company formed under the laws of Kentucky and with its principal place of business at 2150 N Main Street, Jamestown, Kentucky 42629.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and

minimal diversity exists because many putative Class Members are citizens of a different state than Defendant.

14.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in the State of Illinois; has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposely availed itself to the Courts in this District.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District. Upon information and belief, the Data Breach giving rise to this lawsuit occurred in this District.

## BACKGROUND

### Defendants Collected and Stored the PII of Plaintiff and the Class

16.     Defendants Duo County Telephone Cooperative Corporation, Inc. and Cumberland Cellular, LLC operate under the shared branding "Duo Broadband" and sell telecommunications services throughout Kentucky.[4]

17.     Defendant Communications Data Group, Inc. is a software business that sells "broadband, data, utility, and interconnect services" to telecommunications companies.[5] Since at least 2024, Defendant Communications Data Group, Inc. has provided telecommunications services to Duo Broadband.[6]

---

[4] *About Duo Broadband*, DUO BROADBAND https://duobroadband.com/contact-legal-company-information/ (last visited May 20, 2025).
[5] *Home Page*, CDG https://cdg.us/ (last visited May 20, 2025).
[6] *Duo Broadband Selects CDG's BSS/OSS Solutions*, CDG (June 29, 2024) https://cdg.us/duo-broadband-selects-cdgs-bss-oss-solutions/.

18. As part of their business, Defendants receives and maintains the PII of thousands of their current and former customers.

19. In collecting and maintaining the PII, Defendants agreed it would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

20. Under state and federal law, businesses like Defendants have duties to protect their current and former customers' PII and to notify them about breaches.

21. Defendants recognize. these duties. For example, CDG declares in its "Privacy Policy" that:

    a. "CDG clients maintain information necessary to support the products and services they offer to their customers that are maintained within solutions CDG provides."[7]

    b. "That information can include: Customer name, physical address, email address and contact phone numbers; Personal information such as social security number; Creditworthiness including credit scores; Service address, services used and additional information about those services; Account balances and transaction history; Usage information such as telephone calls or pay per view events; History related to customer transactions and interactions."[8]

    c. "CDG discloses information only to its clients or to parties its clients authorize."[9]

---

[7] *Privacy Policy*, CDG https://cdg.us/privacy (last visited May 20, 2025).
[8] *Id*.
[9] *Id*.

d.      "To protect customer and company information from unauthorized access and use, CDG uses security measures that comply with federal / state law and standard industry practices. These measures include computer safeguards and secured files and buildings."[10]

22.     Similarly, Defendants Duo Broadband declare in their "Privacy Statement" that:

a.      "DUO Broadband is committed to protecting your privacy[.]"[11]

b.      "DUO Broadband collects personally identifiable information, such as your email address, name, home or work address or telephone number."[12]

c.      "DUO Broadband does not use or disclose sensitive personal information . . . without your explicit consent."[13]

d.      "DUO Broadband websites will disclose your personal information, without notice, only if required to do so by law or in the good faith belief that such action is necessary[.]"[14]

e.      "DUO Broadband secures your personal information from unauthorized access, use or disclosure."[15]

f.      "DUO Broadband secures the personally identifiable information you provide on computer servers in a controlled, secure environment, protected from unauthorized access, use or disclosure."[16]

---

[10] *Id.*

[11] *Privacy Statement*, DUO BROADBAND https://duobroadband.com/ legal-tariff-and-rights-information/privacy-statement/ (last visited May 20, 2025).

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

g.    "When personal information (such as a credit card number) is transmitted to other Web sites, it is protected through the use of encryption, such as the Secure Socket Layer (SSL) protocol."[17]

***Defendants' Data Breach***

23.    On February 13, 2025, Defendants were hacked in the Data Breach.[18]

24.    Specifically, Communications Data Group, Inc. explained to Class Members that "[w]e serve as a billing vendor for your service provider Duo Broadband" and that "[w]e are writing on behalf of Duo Broadband to tell you about a data security incident that may have exposed some of your personal information."[19]

25.    Worryingly, Defendants already admitted that:

a.    "On February 13, 2025, we discovered a data security incident in which a cyber threat actor attempted to disrupt our systems in a possible effort to deploy ransomware, and solicit a ransom payment from us."[20]

b.    "On March 17, 2025, we detected unauthorized access to certain sensitive personal information of Duo Broadband customers[.]"[21]

26.    Because of Defendants' Data Breach, at least the following types of PII were compromised:

a.    first and last names;

b.    addresses;

---

[17] *Id.*
[18] *Data Breach Notifications*, MAINE ATTY GEN (May 15, 2025)
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/943d1111-7f57-42a2-8259-b0de8e4ba981.html.
[19] *Id.*
[20] *Id.*
[21] *Id.*

    c.     dates of birth; and

    d.     Social Security numbers.[22]

27.     In total, Defendants injured at least 42,518 persons—via the exposure of their PII—in the Data Breach.[23] Upon information and belief, these 42,518 persons include their current and former customers.

28.     And yet, Defendants waited over until May 15, 2025, before it began notifying the class—a full 91 days after the Data Breach was discovered.[24]

29.     Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

30.     And when Defendants did notify Plaintiff and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

    a.     "Please review the enclosed "Additional Resources" section included with this letter."[25]

    b.     "This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission regarding identity theft protection and details on how to place a fraud alert or a security freeze on your credit file."[26]

31.     Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

32.    Since the breach, Defendants claim that they "implemented enhanced security measures to strengthen our protocols and prevent future incidents."[27]

33.    But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

34.    Defendants has done little to remedy their Data Breach. True, Defendants has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that Defendants inflicted upon them.

35.    Because of Defendants' Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***Qilin & the Dark Web***

36.    Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII appear to be the notorious cybercriminal group "Qilin."[28]

37.    Qilin is an especially notorious cybercriminal group. In fact, the federal Office of Information Security released a report warning the public about Qilin.[29] Specifically, the "Threat Profile" stated, *inter alia*, that:

---

[27] *Id.*

[28] Paul Bischoff, *Telecom SaaS firm Communications Data Group notifies 42K people of data breach on behalf of Duo Broadband*, COMPARITECH (May 16, 2025) https://www.comparitech.com/news/telecom-saas-firm-communications-data-group-notifies-42k-people-of-data-breach-on-behalf-of-duo-broadband/.

[29] *Qilin*, OFFICE INFO. SEC. (June 18, 2024) https://www.hhs.gov/sites/default/files/qilin-threat-profile-tlpclear.pdf."

      a.      "Qilin is a ransomware-as-a-service (RaaS) offering in operation since 2022[.]"[30]

      b.      "The group likely originates from Russia and was recently observed recruiting affiliates in late 2023."[31]

      c.      "Researchers have identified dark web posts associated with Qilin in 2022 by a user who is likely connected to the RaaS group."[32]

      d.      "Victims are directed to communicate with the attackers via dark web portals or encrypted messaging services, ensuring the attackers' anonymity and complicating law enforcement efforts to track interactions."[33]

      e.      "[A]ctors practice double extortion and operate a data leak site (DLS) where victims are posted."[34]

38.    Here, third-party reports have confirmed that "[r]ansomware gang Qilin claimed responsibility for the breach at CDG in March 2025."[35]

39.    To make matters worse, screenshots of Qilin's Dark Web website—from March 7, 2025—confirms that Qilin (1) successfully exfiltrated data, and (2) already published the data on the Dark Web.[36] Two screenshots are provided below (although parts are redacted to prevent dissemination of the stolen data).

---

[30] *Id*.
[31] *Id*.
[32] *Id*.
[33] *Id*.
[34] *Id*.
[35] Paul Bischoff, *Telecom SaaS firm Communications Data Group notifies 42K people of data breach on behalf of Duo Broadband*, COMPARITECH (May 16, 2025) https://www.comparitech.com/news/telecom-saas-firm-communications-data-group-notifies-42k-people-of-data-breach-on-behalf-of-duo-broadband/.
[36]





40.     Still, despite this public evidence of broad misuse, Defendants misleadingly claim that "we have found no evidence that this information has been misused[.]"[37]

41.     Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by Qilin on the Dark Web.

***Plaintiff's Experiences and Injuries***

42.     Plaintiff Michele Watson is a former customer of Duo Broadband.

43.     Thus, Defendants obtained and maintained Plaintiff's PII.

44.     As a result, Plaintiff was injured by Defendants' Data Breach.

45.     Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner.  She is careful to store any documents containing her PII in a secure location.

46.     Plaintiff provided her PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

47.     Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

48.     Plaintiff received a Notice of Data Breach in May 2025.

49.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

50.     Through their Data Breach, Defendants compromised Plaintiff's PII.

---

[37] *Data Breach Notifications*, MAINE ATTY GEN (May 15, 2025)
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/943d1111-7f57-42a2-8259-b0de8e4ba981.html.

51.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendants directed Plaintiff to take those steps in their breach notice.

52.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

53.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

54.    Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

55.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

56.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

57.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

58.    Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

59.     In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[38] Therein, Cisco reported the following:

a.     "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[39]

b.     "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[40]

c.     89% of consumers stated that "I care about data privacy."[41]

d.     83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[42]

e.     51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[43]

f.     75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[44]

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

---

[38] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[39] *Id.* at 3.
[40] *Id.*
[41] *Id.* at 9.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 11.

60.     Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

      a.     loss of the opportunity to control how their PII is used;

      b.     diminution in value of their PII;

      c.     compromise and continuing publication of their PII;

      d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

      e.     lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

      f.     delay in receipt of tax refund monies;

      g.     unauthorized use of their stolen PII; and

      h.     continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII.

61.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

62.     The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

63.     It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

64.     One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

65.     The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

66.     In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

67.     Defendants disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

68.     Defendants' failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

69.     Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

70.     In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[45]

71.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[46]

72.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Failed to Follow FTC Guidelines***

73.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines

---

[45]  *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.
[46] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

74.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[47]  The FTC declared that, *inter alia*, businesses must:

      a.      protect the personal customer information that they keep;

      b.      properly dispose of personal information that is no longer needed;

      c.      encrypt information stored on computer networks;

      d.      understand their network's vulnerabilities; and

      e.      implement policies to correct security problems.

75.     The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

76.     Furthermore, the FTC explains that companies must:

      a.      not maintain information longer than is needed to authorize a transaction;

      b.      limit access to sensitive data;

      c.      require complex passwords to be used on networks;

      d.      use industry-tested methods for security;

      e.      monitor for suspicious activity on the network; and

      f.      verify that third-party service providers use reasonable security measures.

77.     The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and

---

[47] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.    In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former customers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

79.    Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

80.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

81.    Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04)

and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

82.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

83.    Plaintiff brings this class action under Federal Rule of Civil Procedure 23 individually and on behalf of all members of the following Nationwide Class:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered by Defendants in February 2025, including all those individuals who received notice of the breach.

84.    Plaintiff also proposes the following Kentucky subclass, represented by Plaintiff Michele Watson:

> All individuals residing in Kentucky whose PII was compromised in the Data Breach discovered by Defendants in February 2025, including all those individuals who received notice of the breach.

Together, the Nationwide Class and the Kentucky Subclass are referred to as the "Class."

85.    Excluded from the Class are Defendant, their agents, affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

86.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

87.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

88.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 42,518 members.

89.    <u>Typicality</u>. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

90.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

91.    <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

    a.    if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

    b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    if Defendants were negligent in maintaining, protecting, and securing PII;

d.    if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e.    if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.    if Defendants' Breach Notice was reasonable;

g.    if the Data Breach caused Plaintiff and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

92.    <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

93.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

94.     Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

95.     Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

96.     Defendants has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

97.     Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' PII.

98.     Defendants owed—to Plaintiff and Class Members—at least the following duties to:

a.     exercise reasonable care in handling and using the PII in their care and custody;

b.     implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c.     promptly detect attempts at unauthorized access;

d.     notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

99.    Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

100.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

101.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

102.    Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendant.

103.    Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

104.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive PII.

105.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

106.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

107.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

108.    Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

109.    Defendants breached these duties as evidenced by the Data Breach.

110.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

      a.    disclosing and providing access to this information to third parties and

      b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

111.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

112.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

113.    Defendants has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

114.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

115.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

116.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Kentucky Subclass)

117.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

118.    Pursuant to K.R.S. § 365.732(2), Defendants owed duties to "disclose any breach of the security of the system, following discovery or notification of the breach in the security of the data, to any resident of Kentucky whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person" and "in the most expedient time possible and without unreasonable delay[.]" K.R.S. § 365.732(2).

119.    Defendants breached their duties under K.R.S. § 365.732(2) by failing to provide timely notice to Kentucky Subclass Members.

120.    Defendants began providing notice a full 91 days after the Data Breach was discovered—under the circumstances, such a delay was unreasonable and constitutes negligence *per se*.

121.    But for Defendants' wrongful and negligent breach of their duties owed, Plaintiff and Kentucky Subclass Members would not have been injured.

122.    The injury and harm suffered by Plaintiff and Kentucky Subclass Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that their breach would cause Plaintiff and members of the Kentucky Subclass to suffer the foreseeable harms associated with the exposure of their PII.

123.    Defendants' various violations and their failure to comply with applicable laws and regulations constitute negligence *per se*.

124.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Kentucky Subclass Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

125.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

126.    Plaintiff and Class Members either directly contracted with Defendants or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

127.    Plaintiff and Class Members (or their third-party agents) were required to provide their PII to Defendants as a condition of receiving services provided by Defendant. Plaintiff and Class Members (or their third-party agents) provided their PII to Defendants or their third-party agents in exchange for Defendants' services.

128.    Plaintiff and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

129.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

130.    Plaintiff and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for services.

131.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

132.    In their Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

133.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

134.    After all, Plaintiff and Class Members (or their third-party agents) would not have entrusted their PII to Defendants (or their third-party agents) in the absence of such an agreement with Defendant.

135.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

136.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to their form.

137.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

138.    Defendants materially breached the contracts it entered with Plaintiff and Class Members (or their third-party agents) by:

    a.    failing to safeguard their information;

    b.    failing to notify them promptly of the intrusion into their computer systems that compromised such information.

    c.    failing to comply with industry standards;

d.      failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.      failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

139.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

140.    Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

141.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

142.    Plaintiff and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

## FOURTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

143.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

144.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

145.    Defendants owed a duty to their current and former customers, including Plaintiff and the Class, to keep this information confidential.

146.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

147.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

148.    The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

149.    Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew their information security practices were inadequate.

150.    Defendants acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

151.    Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

152.    As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and rediscloure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

153.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

154.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

155.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

156.    In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class Members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

157.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

158.    This claim is pleaded in the alternative to the breach of implied contract claim.

159.    Plaintiff and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their PII to provide services, and (2) accepting payment.

160.    Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

161.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

162.    Defendants enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

163.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

164.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) payment because Defendants failed to adequately protect their PII.

165.    Plaintiff and Class Members have no adequate remedy at law.

166.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

167.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

168.    Given the relationship between Defendants and Plaintiff and Class Members, where Defendants became guardian of Plaintiff's and Class Members' PII, Defendants became a fiduciary by their undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

169.     Defendants has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

170.     Because of the highly sensitive nature of the PII, Plaintiff and Class Members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

171.     Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII.

172.     Defendants also breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

173.     As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### SEVENTH CAUSE OF ACTION
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ICLS 505/1, *et seq***
**(On Behalf of Plaintiff and the Class)**

174.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

175.     This claim is brought under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

176.     Plaintiff and Class Members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

177.     Plaintiff, the Class, and Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

178.    The ICFA applies to Defendants because Defendants engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

179.    Defendants violated the ICFA by, *inter alia*:

a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by

the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

180.    Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

181.    Defendants intended to mislead Plaintiff and Class Members and induce them to rely on their omissions.

182.    Had Defendants disclosed to Plaintiff and Class Members (or their third-party agents) that their data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Class Members (or their third-party agents) entrusted to it while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

183.    Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights.

184.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

185.     And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

186.     Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law.

187.     Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

188.     Defendants also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Class of the nature and extent of the Data Breach pursuant to the Illinois PII Protection Act, 815 ILCS 530/1, *et seq*.

189.     Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff and the Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the ICFA.

### EIGHTH CAUSE OF ACTION
**Violation of the Kentucky Consumer Protection Act (KCPA)**
**Ky. Rev. Stat. §§ 367.110, *et seq*.**
**(On Behalf of Plaintiff and the Kentucky Subclass)**

190.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

191.     Plaintiff, Class Members, and Defendants all constitute "[p]erson[s]" under KRS §367.110(1).

192.     The KCPA applies to Defendants because Defendants engage in "[t]rade" and "commerce" as defined by KRS § 367.110(2).

193.     The KCPA provides that "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." KRS § 367.170(1).

194.    Defendants violated the KCPA by, *inter alia*:

   a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Kentucky Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

   b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c.    failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Kentucky Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

   d.    omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Kentucky Subclass Members' PII; and

   e.    omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Kentucky Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

195. Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

196. Defendants intended to mislead Plaintiff and Kentucky Subclass Members and induce them to rely on their omissions.

197. Had Defendants disclosed to Plaintiff and Kentucky Subclass Members (or their third-party agents) that their data systems were not secure—and thus vulnerable to attack— Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Kentucky Subclass Members (or their third-party agents) entrusted to it while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiff and Kentucky Subclass Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

198. Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Kentucky Subclass Members' rights.

199. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Kentucky Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

200. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

201.    Plaintiff and Kentucky Subclass Members seek all monetary and non-monetary relief allowed by law.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.    Enjoining Defendants from further unfair and/or deceptive practices;

E.    Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.    Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.


Date: June 17, 2025

Respectfully submitted,

By: */s/ Raina C. Borrelli*
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorneys for Plaintiff and Proposed Class*